CALEX, INC. and Inservco, Petitioners

v.

## WORKERS' COMPENSATION APPEAL BOARD (VANTAGGI), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 12, 2008.

Decided March 26, 2009.

---

Joseph M. Caputo, Scranton, for petitioners.

Charles L. Consagra, Scranton, for respondent.

BEFORE: SMITH–RIBNER and LEAVITT, JJ., and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

Calex, Inc. (Employer) petitions for review of an adjudication of the Workers' Compensation Appeal Board (Board) affirming the decision of a Workers' Compensation Judge (WCJ) to grant the claim petition of John Vantaggi (Claimant). Employer contends that Claimant's medical evidence did not prove that his cervical problems were work-related because his expert did not consider all of Claimant's medical records when he rendered his opinion. Employer also contends that the Board erred in awarding Claimant reimbursement for the cost of his comprehensive health insurance coverage. We affirm the award of medical and disability compensation but set aside the award of reimbursement of Claimant's health insurance premiums.

On January 14, 2006, Claimant, a truck driver, was involved in an accident in California when the tractor trailer he was operating collided with a guard rail. Claimant reported the accident and returned to Employer's Pittston, Pennsylvania terminal approximately one week later. Because he reported low back pain to his supervisor, Stan Malinowski, Claimant was referred to a panel physician, Dr. Stankowski, who directed Claimant not to work for several days. Dr. Stankowski's notes recorded that Claimant complained of lower back pain, a condition for which he had received surgical treatment in 1972. Claimant returned to work and continued

making runs between California and Pittston until late April 2006, when he was discharged by Employer for not reporting his whereabouts.[1]

On May 31, 2006, Claimant filed a claim petition alleging an injury date of January 14, 2006. Claimant described his injuries as an "aggravation of a low back injury and psychosis as a result of a closed brain injury." Claim Petition ¶ 1. Claimant later amended his claim petition to withdraw the claim for a psychiatric injury. Employer denied the allegations in the petition, and the parties proceeded to a hearing.

Claimant testified that he reported complaints of lower back pain, stiffness in his neck and upper shoulders, and numbness in his leg to Dr. Stankowski. Claimant stated that he did not have any trouble with his work until late March 2006, when on a trip to California he began to experience headaches above his right eye so severe it caused hallucinations. Nevertheless, Claimant continued working until, in April while in California, he found himself unable to continue driving the truck.[2] Claimant sought medical treatment in California and then returned to Manville, New Jersey, where he sought psychiatric treatment from Dr. Otalomey. He also sought treatment from Christopher Lycette, M.D., a Pennsylvania neurosurgeon, to whom he was referred by Dr. Otalomey.

In spite of treatment, Claimant testified that he still has headaches; trouble sleeping; limited neck movement; and numbness. He is on a number of medications such as vicodin, zoloft, depakote and respirdal, prescribed by Dr. Otalomey.

In a second hearing, Claimant testified about the costs of his medical treatments. Part of these costs were paid by New Jersey Medicaid and part by his Geisinger health insurance coverage provided through Employer's group plan. After Claimant stopped working, he continued his coverage through the Employer-sponsored plan by making monthly COBRA premium payments. His COBRA premium for 10 months of coverage with Geisinger was $3,986.18.

Claimant offered the deposition testimony of Dr. Lycette, a neurosurgeon who first examined Claimant on July 25, 2006. Claimant presented with neck pain and right upper extremity pain, as well as numbness, severe headaches and diminished strength on his right side. Dr. Lycette reviewed an MRI of Claimant's head and lumbar spine as well as a CT scan of Claimant's head; he also ordered another MRI that day. At Claimant's August appointment, Dr. Lycette learned, for the first time, that Claimant had been involved in a motor vehicle accident in January 2006. Dr. Lycette testified that Claimant's July 25, 2006, MRI showed bilateral facet arthrosis, moderate spinal stenosis as well as degenerative changes and edema related to microfractures. Dr. Lycette opined that "typically" such microfractures are caused by trauma of the type Claimant reported he experienced in the January 2006 motor vehicle accident. Reproduced Record at 165a (R.R. ——). Dr. Lycette also noted that Claimant had not experienced any cervical symptoms prior to the accident.

On September 18, 2006, Dr. Lycette performed a cervical fusion on Claimant. By

1. Malinowski, Claimant's supervisor, testified that Claimant was late on a delivery and did not call in to report his whereabouts for approximately two days. Employer reported the truck as stolen.

2. Claimant suggested that it was headaches that disabled him in April. Malinowski, Claimant's supervisor, testified that Claimant told him that it was an infection, involving vomiting and fever, that disabled him.

September 25, 2006, Claimant reported that his headaches had resolved and the numbness in his hands had improved; however, he continued to experience lower back and leg pain.[3]

On cross-examination, Dr. Lycette acknowledged that Claimant did not provide him with all of his previous medical records; that his opinion that Claimant's cervical condition was work-related was based on Claimant's description of the January 2006 motor vehicle accident; that his knowledge of the January accident was not detailed but limited to the simple fact that Claimant's truck hit some kind of immovable object; that he did not know when Claimant's neck pain became significant; that Claimant's multilevel degenerative disc disease was not caused by the January 2006 accident; that it was "unclear" whether the edema and microfractures were related to trauma or degenerative changes because it is not uncommon for individuals with these changes to become symptomatic in the absence of a traumatic event (R.R. 177a); that it would be "more typical" for an individual who had suffered a cervical injury in an accident on January 14, 2006, to complain of neck pain on January 23, 2006, when Claimant saw Dr. Stankowski (R.R. 182a); and, finally, a person who suffered a cervical injury would complain of cervical pain "shortly thereafter" or within thirty days of the event. (R.R. 183a).

Employer offered the deposition testimony of William H. Spellman, M.D., board-certified in orthopedic surgery, who evaluated Claimant on January 12, 2007, and reviewed Claimant's medical history and records. Dr. Spellman observed that Dr. Stankowski, the first physician to see Claimant after the motor vehicle accident, diagnosed Claimant with a low-back sprain. Dr. Stankowski's notes did not record that Claimant complained of neck pain, and they did not record any physical findings that would be consistent with a neck injury. The first medical report of Claimant's neck pain was from the Easton Family Practice on June 16, 2006, and it did not mention Claimant's January 2006 motor vehicle accident. Dr. Spellman also reviewed Claimant's CT scan of the head and Claimant's MRIs; each recited that they were being performed as a result of a motor vehicle accident.

Based upon his physical examination, his review of Claimant's records, diagnostic studies and history, Dr. Spellman testified that Claimant had no problems in his lower back and, therefore, his low-back injury had ceased to be disabling. Dr. Spellman also testified that Claimant's cervical surgery could not be related to Claimant's January 2006 motor vehicle accident because Claimant had not complained to any physician about his neck until June 2006. If Claimant had injured his neck in January sufficiently to require surgery six months later, Dr. Spellman stated that Claimant would have experienced immediate and significant neck symptoms, which would not have escaped detection in a medical examination.

The WCJ credited the testimony of Claimant. The WCJ found Dr. Lycette to be credible and more persuasive than Dr. Spellman. The WCJ acknowledged that there was no medical record of Claimant's neck problems until six months after the January 2006 motor vehicle accident. However, he found that Claimant credibly testified that he did experience neck pain

---

3. Dr. Lycette saw Claimant for a final time on January 25, 2007. At that meeting, Claimant reported to Dr. Lycette that he had seen another orthopedic surgeon for a second opinion, who performed some kind of spine manipulation. Thereafter, Claimant began experiencing headaches, left-sided neck pain, and shoulder pain.

at the time of the January 2006 accident and by March 2006 was suffering headaches. Further, Dr. Lycette, who was also credited, accepted Claimant's account and related Claimant's cervical problems to his January 2006 motor vehicle accident. The WCJ granted Claimant's petition, finding Claimant totally disabled by his work injuries, defined as an aggravation to Claimant's pre-existing neck and back degenerative disease. In addition, the WCJ granted Claimant's request for reimbursement of his COBRA insurance premium payments in the amount of $3,986.18. The Board affirmed, and Employer filed the present appeal.

■ On appeal, Employer presents two issues for our consideration.[4] First, Employer contends that the WCJ erred because Claimant did not satisfy his burden of proving that his neck problems were caused by the January 2006 accident. Employer contends that there is no contemporary medical evidence that Claimant sustained a cervical injury in the January 14, 2006, accident and that Dr. Lycette's testimony was not competent to establish Claimant's neck problems as work-related. Second, Employer contends that the WCJ erred by awarding Claimant reimbursement of his premium payments for comprehensive health insurance coverage.

We begin with Employer's first issue. Employer contends that the WCJ's finding that Claimant was disabled as of April 9, 2006, to the present by the January 2006 accident is not supported by substantial evidence. Claimant did not produce any medical evidence that Claimant exhibited any symptoms of cervical injury prior to July 25, 2006. Therefore, Claimant's testimony, even if credible, does not establish a cervical injury or disability as of April 9, 2006.

■ The claimant in a worker's compensation case has the burden of proving the causal connection between his alleged disability and the injury he sustained at work. *Fotta v. Workmen's Compensation Appeal Board, (U.S. Steel/USX Corp. Maple Creek Mine)*, 534 Pa. 191, 194, 626 A.2d 1144, 1146 (1993). In the event there is no obvious causal connection between the alleged disability and the accident, the claimant must establish causation by unequivocal medical testimony. This medical witness must testify, not that the injury or condition might have or possibly came from the assigned cause, but that the condition did come from the work-related cause. *Lewis v. Commonwealth*, 508 Pa. 360, 365–366, 498 A.2d 800, 802 (1985). Of course, the WCJ is the sole arbiter of fact and may accept or reject the testimony of any witness in whole or in part. *American Contracting Enterprises, Inc. v. Workers' Compensation Appeal Board (Hurley)*, 789 A.2d 391, 395 (Pa.Cmwlth.2001).

■ Claimant testified that after the January 2006 accident he reported complaints of lower back pain, *stiffness in his neck and upper shoulders* and numbness in his leg to the panel doctor, Dr. Stankowski. Although Claimant did not testify that he reported neck pain to Dr. Stankowski, he did testify that he told Dr. Lycette that he experienced pain in January. Claimant's testimony was credited by the WCJ. Further, Dr. Lycette testified that Claimant's MRI showed edema related to microfractures of a type typically due to trauma, such as that Claimant reported

4. Our scope of review is limited to determining whether there has been a constitutional violation, errors of law committed, or whether the necessary findings of fact are supported by substantial evidence. *Fotta v. Workers' Compensation Appeal Board (U.S. Steel/USX Corp.)* 714 A.2d 479, 481 n. 5 (Pa.Cmwlth. 1998).

that he suffered in the January 2006 motor vehicle accident.

Employer contends that the testimony of Dr. Lycette is not competent. The physicians who saw Claimant after the accident ordered CT scans and MRIs of Claimant's lower back and brain, but they did not order any test of Claimant's neck. Had Claimant complained of neck pain, it is only logical, Employer argues, that scans would have been ordered for his neck as well. Further, complaints of neck pain were nowhere recorded in any doctor's notes until June 16, 2006. Dr. Lycette explained that Claimant's degenerative disease in his neck was tolerable, but not symptomatic, until he was involved in the accident, which Dr. Lycette believed caused inflammation and led to Claimant's significant complaints. This opinion is incompetent, according to Employer, because Dr. Lycette did not review all of Claimant's medical records but, instead, based his opinion on Claimant's statements that were not even consistent with Claimant's medical records.

In *Newcomer v. Workmen's Compensation Appeal Board (Ward Trucking Corp.)*, 547 Pa. 639, 692 A.2d 1062 (1997), the claimant's expert opinion was found incompetent. The claimant described his work accident to his medical expert in a way that was quite different from the description given to the physicians who treated the claimant at the time of injury. In addition, the claimant's expert rendered an opinion without reviewing the claimant's original injury records. Employer argues that under *Newcomer*, Dr. Lycette's opinion was not competent. We disagree.

Here, the description of Claimant's accident has not changed. It was a vehicle accident in which Claimant's truck hit an immovable object, *i.e.*, a guardrail. Further, Claimant testified that he did experience neck pain soon after the accident and that he reported neck "stiffness" to Dr. Stankowski. It is true that the tests prompted by his work-related injuries did not cover Claimant's neck.[5] Indeed, neck pain does not appear in Claimant's medical records until June 16, 2006. Stated otherwise, Claimant's testimony about immediate neck pain is not corroborated by his medical records. Nevertheless, Claimant's testimony was credited by the WCJ, and in *Newcomer* the claimant's testimony was not credited. The WCJ did not find the discrepancies between Claimant's testimony and his medical records compelling. The WCJ believed, apparently, that Dr. Stankowski's notes were incomplete.

Employer believes that Dr. Lycette should have reviewed these medical records, which do not confirm Claimant's testimony about neck pain, before rendering his opinion. However, there is no requirement that a medical expert review all medical records. We have explained that "the fact that a medical expert does not have all of a claimant's medical records goes to the weight given the expert's testimony, not its competency." *Marriott Corporation v. Workers' Compensation Appeal Board (Knechtel)*, 837 A.2d 623, 631 n. 10 (Pa. Cmwlth.2003) (citation omitted).

Employer also directs the Court's attention to *Long v. Workers' Compensation Appeal Board (Integrated Health Service,*

5. A CT scan of Claimant's head was ordered on April 17, 2006. The MRI report on Claimant's lumbar spine was done on June 23, 2006. These studies were undertaken, as stated in the relevant reports, as a result of Claimant's January 2006 vehicle accident. A June 6, 2006, MRI reported disc disease at C5–C6, C6–C7 and C7–T1. It did not report microfractures. Dr. Lycette explained that this report was not inconsistent with the MRI of July 25, 2006, because a report reflects the interpretation of the radiologist reading the film.

*Inc.)*, 852 A.2d 424 (Pa.Cmwlth.2004). There, the claimant's medical expert immediately recanted his opinion upon being given information that contradicted the claimant's description of the work-related accident. *Id.* at 428. Here, Dr. Lycette acknowledged that he did not know the details of Claimant's accident. However, he did know that Claimant was driving a truck when it hit an immovable object. Dr. Lycette opined that an accident of this sort typically causes trauma to the neck, specifically microfractures. Further, Dr. Lycette did not recant when given more information about Claimant's medical history during his cross-examination.

*Newcomer* requires that a medical experts opinion cannot be based upon false or inaccurate information about an accident. *Long* requires that an expert not recant when given correct information about an accident. Neither principle has direct application here. Dr. Lycette made a number of damaging concessions, such as the fact that cervical disc disease can suddenly cause extreme pain even without any precipitating event, such as a truck accident. Further, Dr. Lycette was not rehabilitated by Claimants counsel after making these concessions.

On the other hand, Dr. Lycette did not recant his opinion that ` Claimants neck problems were caused by the truck accident. This is a close case, but in the end we cannot conclude that Dr. Lycette's opinion is incompetent. The WCJ made every credibility determination in favor of Claimant and against Employer. He found that Claimant experienced neck pain soon after the truck accident, even though complaints of neck pain are not corrobo-

rated by Claimant's medical records. In short, there is enough in the record to support Dr. Lycette's understanding of the accident, its impact on Claimant and his opinion that Claimant's cervical injury was work-related.

■ Employer next contends that the Board erred in finding Claimant entitled to reimbursement of his COBRA premium payments.[6] Employer contends that the Workers' Compensation Act (Act)[7] does not require an employer to reimburse a claimant for premium payments made to secure comprehensive health insurance. We agree.

In *Fotta v. Workers' Compensation Appeal Board (U.S. Steel/USX Corp.)*, 714 A.2d 479 (Pa.Cmwlth.1998), a claimant sought reimbursement for premium payments made to continue his employer-sponsored health insurance coverage after his employment terminated. The WCJ awarded reimbursement, and this Court reversed. We held that "nowhere does the [Workers' Compensation] Act require an employer to reimburse an injured employee for health insurance premiums that a claimant utilizes to pay for work-related medical expenses while the claim is being contested." *Id.* at 482. The Court relied upon Section 306(f.1) of the Act, which provides in relevant part:

> The employer shall provide payment in accordance with this section for reasonable surgical and medical services, services rendered by physicians or other health care providers, including an additional opinion when invasive surgery

6. The WCJ refers to "COBRA co-payments." It is not clear what this means. A COBRA premium is for coverage provided by an insurer to an employer group. A "co-payment" is an amount paid to a provider because the health insurance policy places some of the

cost of medical treatment upon the policyholder.

7. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708.

may be necessary, medicines and supplies, as and when needed. 77 P.S. § 531(1)(i).[8] However, the Act requires that an employer pay for all bills that the WCJ finds causally related to the work injury. *Fotta*, 714 A.2d at 482.

The WCJ tried to distinguish *Fotta* on the facts. The claimant in *Fotta* was on partial disability, and the health insurance coverage he purchased was for himself and his wife. In this case, Claimant is totally disabled, and his Geisinger coverage covered only himself. These factual distinctions are irrelevant. Section 306(f.1) of the Act governs the sum total of an employer's obligation for medical compensation, and it does not include payment of premium for a health insurance policy that covers any and "all illnesses and injuries no matter what they are," which is the central point of *Fotta*, 714 A.2d at 482. As in *Fotta*, Claimant's health insurance coverage with Geisinger covered all sickness and injury claims, which far exceeds the medical treatments provided to an injured employee under the Act. The WCJ erred in ordering reimbursement of Claimant's COBRA premium payments, but Employer is, of course, liable for the cost of medical treatments related to Claimant's work injury. This may include Claimants copayments and deductibles imposed in his Geisinger policy, if any were incurred for treatment of his work injuries.

For the foregoing reasons, the order of the Board is affirmed in part and reversed in part consistent with this opinion.

### ORDER

AND NOW, this 26th day of March, 2009, the order of the Workers' Compensation Appeal Board dated August 20, 2008, in the above-captioned matter is hereby AFFIRMED IN PART and REVERSED IN PART, consistent with the foregoing opinion.

CONCURRING/DISSENTING OPINION by Judge SMITH–RIBNER.

I agree with the majority's decision to affirm the order of the Workers' Compensation Appeal Board (Board) upholding a decision entered by the Workers' Compensation Judge (WCJ) to grant Claimant John Vantaggi's claim petition for work injuries sustained on January 14, 2006 in the course of his employment as a truck driver for Employer Calex, Inc. I dissent, however, from its decision to reverse the award to Claimant for reimbursement of $3986.18 representing the COBRA co-payment insurance premiums that he paid to Employer after it ceased health insurance coverage for Claimant. He became totally disabled and stopped working in April 2006.

As the sole fact finder in this matter, the WCJ acted within his power in crediting Claimant's testimony that the only medical treatment paid for through his COBRA co-payments was the treatment for his work injuries. Also, Claimant's COBRA co-payments were solely for his coverage and no one else. The WCJ distinguished this case from *Fotta v. Workers' Compensation Appeal Board (U.S. Steel/USX Corp.)*, 714 A.2d 479 (Pa.Cmwlth.1998), where this Court held that the claimant there was not entitled to reimbursement for health insurance premiums paid for medical expenses

---

**8.** The Court in *Fotta* considered Section 306(e) of the Act of June 2, 1915, P.L. 736. The section was amended by the Act of July 2, 1993, P.L. 190, and renumbered Section 306(f.1). There are no substantive differences between Section 306(f.1) and former Section 306(e).

while his claim was being contested. The employer had ended the claimant's health coverage, and he had to pay for health coverage at a cost of $7130.45 to Blue Cross/Blue Shield, which included coverage for his wife.

The WCJ in *Fotta* initially found that the claimant's injury was not work related, which was affirmed by the Board and by this Court, but the Supreme Court held that the claimant did suffer a disability caused in part by his fall at work and reversed this Court. The WCJ was required to determine on remand the reasonableness and necessity of the medical expenses incurred. The WCJ denied reimbursement for the private premiums paid to Blue Cross/Blue Shield, and upon appeal by the claimant this Court affirmed, pointing out that nothing in the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708, authorized reimbursement for private medical insurance obtained by the claimant to cover all of his illnesses and injuries no matter what the cause. The case *sub judice,* however, is totally distinct.

In the present case, the WCJ awarded reimbursement of the COBRA premiums as part of the reasonable and necessary medical benefits due Claimant under the Act, and he reasoned as follows:

> Claimant [credibly] testified that the only medical treatment paid for through his COBRA co-payments was the treatment he received for his work injuries. Additionally, Claimant argues in his brief that, while in Fotta the claimant paid premiums that included coverage for his spouse, his COBRA co-payments were only for his own coverage. Given these factual differences, this Judge, again, shall conclude that Claimant is entitled to reimbursement of his COBRA co-payments totaling $3,986.18.

Under Section 306(f.1) of the Act, 77 P.S. § 531, an employer is required to pay for all reasonable and necessary medical expenses related to a claimant's work injuries when found liable for those injuries. Because Claimant was required to make the COBRA premiums to cover medical expenses related to the work injuries, he is entitled to reimbursement of these expenses, and nothing in *Fotta* precludes the WCJ's award made in this regard. The WCJ found that Claimant suffered work injuries and that Claimant was required to pay the insurance premiums through his employer to cover medical treatment for those work injuries. But for Employer's refusal to continue his coverage, Claimant would not have been required to pay the $3986.18 to cover medical expenses related to his work injuries. Employer was responsible for Claimant's medical costs as and when needed, *Fotta,* and its failure to cover those costs when incurred caused further expense to Claimant. The Act simply was not intended to penalize an injured worker in this manner, and applying its humanitarian purposes warrants affirming the reimbursement award. I dissent.